UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. S2 4:21-CR-54 AGF DDN |
| | ) | |
| ANTONIO DIXSON, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION TO DISMISS COUNT 7 OF THE INDICTMENT AND MEMORANDUM IN SUPPORT

COMES NOW defendant, Antonio Dixson, by and through his attorney of record, and moves to dismiss Count 7 of the second superseding indictment pursuant to Fed. R. Crim. P. 12(b). The Court can adjudicate this pretrial motion because it is subject to determination without trial of any issue. Defendant believes that this motion is supported by *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 211 (2022), and more recently by the well-reasoned opinion in *United States v. Price*, ___ F.Supp.3d _____, 2022 WL 6968457 (S.D.W. Oct. 12. 2022).

### 1.    Factual Background

Antonio Dixson was initially charged in this Court by indictment on January 27, 2021. (Doc. #1). In that initial three count indictment, Antonio Dixson was charged in Count 1 with a violation of 21 U.S.C. § 840(a)(1); 18 U.S.C. § 924(c)(1), and a violation of 18 U.S..C. § 922(g)(1). Subsequently, Antonio Dixson and an individual, Brian Sopshire, were charged in a first superseding indictment filed with the Court on April 7, 2021. In that first superseding indictment, Antonio Dixson was charged in seven counts of the eight count first superseding indictment. In the first superseding indictment, Antonio Dixson was charged with violations of: Count 1, 21 U.S.C. §

840(a)(1); Count 2, 18 U.S.C. § 924(c)(1); Count 3, 18 U.S.C. § 922(g)(1), Count 4, 21 U.S.C. § 841(a)(1); Count 5, 18 U.S.C. 924(c)(1); Count 6, 18 U.S.C. § 922(g)(1); and Count 8, 18 U.S.C. § 922(k).  On January 4, 2023, Antonio Dixson was charged in a second superseding indictment. The second superseding indictment eliminated defendant, Brian Sopshire, who has previously pled guilty and been sentenced by the Court.   However, the seven charges contained in the first superseding indictment now form the basis for a seven count second superseding indictment.

Count 7 of the second superseding indictment charges an offense under 18 U.S.C. § 922(k) based upon Mr. Dixson's alleged possession of a firearm with an obliterated or removed serial number.  The text of the Second Amendment protects his possession of a firearm in such a condition in that the Second Amendment protects the keeping and bearing of firearms.  The restriction that § 922(k) imposes on this conduct was unknown at the time of the enactment of the Second Amendment for over one hundred and fifty years that followed.  Section 922(k) addresses no modern problem that the founders also did not face, yet for generations, the government refused to impose anything resembling its prohibitions.  That is fatal under *New York State & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 211 (2022).  Because § 922(k) restricts protected conduct in a way that has no historical parallel, it is unconstitutional both on its face and as applied to Mr. Dixson.

The indictment here charges an offense under 18 U.S.C. § 922(k) based on Mr. Dixson's alleged possession of a firearm with an obliterated serial number.   The text of the Second Amendment protects his receipt of a firearm as a precondition to keeping and bearing a firearm.  The blanket restriction that § 922(k) imposes on this conduct was unknown at the time of the founding and the century and a half that followed.  Section 922(k) address no modern problem that the founders did not also face, yet for generations the government refused to impose anything resembling

2

its sweeping prohibitions.  That is fatal under *Bruen*.  Because § 922(k)  restricts protected conduct

in a way that has no historical parallel, it is unconstitutional both on its face and as applied to Mr.

Dixson.[1]

The Supreme Court upended the Second Amendment jurisprudence of every federal Circuit

this summer in *Bruen*.  *Bruen* subjects all firearm regulations to a simple but demanding test.  If "the

Second Amendment's plain text covers an individual's conduct," then "the Constitution

presumptively protects that conduct."  *Bruen*, 142 S.Ct. At 2126.[2]  The government then must rebut

that presumption by showing that the challenged law "is consistent with the Nation's historical

tradition of firearm regulation."  *Id*. At 2130.  If it cannot carry that heavy burden, the analysis stops

there: a court cannot employ a subjective, twenty-first century means-ends balancing to save the

challenged law.  *Id*. at 2126.

The Second Amendment provides, "[a] well regulated Militia, being necessary to the security

of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const.

Amend. II.  In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the

Second Amendment codified a pre-existing individual right to possess and use firearms for lawful

purposes like self-defense.  The Court canvassed "the historical background of the Second

---

[1]

*Bruen* did not distinguish between facial and as-applied challenges and instead set a framework for all Second Amendment challenges without qualification.  *Id*. At 2129 (reiterating "the standard for applying the Second Amendment" without facial/as-applied distinction).  Mr. Dixson asserts that facial and as-applied challenges are one and the same under *Bruen*.  *See, e.g.*, *United States v. Collette*, No. 22-CR-00141-DC, 2022 WL 4476790, at \*1, \*1 (W.D. Tex. Sep. 25, 2022) (unpublished slip op.) (collapsing facial and as-applied analysis of 18 U.S.C. § 922(g)(1) post-*Bruen*).

[2]Unless otherwise noted, this motion omits internal citations.

Amendment," including English history from the 1600s through American independence, colonial law and practice leading up to an immediately following 1791 and examined evidence of how the Second Amendment was interpreted in the century after its enactment (e.g., legal treatises, pre-Civil War case law, post-Civil War legislation, and late-19th century commentary). *Id.* at 592-619. Based on this survey, the Court concluded the right protected by the Second Amendment is "not limited to the carrying of arms in a militia." *Id.* at 586. Rather, "the Second Amendment confers an individual right to keep and bear arms" that "belongs to all Americans." *Id.* at 581, 622. The Court, therefore, struck down the District of Columbia's statutes that prohibited the possession of handguns in the home and required that any other guns in the home be kept inoperable." *Id.* at 628-34.

Two years later, in *McDonald v. City of Chicago*, 561 U.S. 742, 278 (2010), the Court reaffirmed that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." In holding that the Second Amendment applies against the states as well as the federal government, the Court described the right to keep and bear arms as "fundamental our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition." *Id.* At 767. And that right, the Court warned, should not be treated "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Id.* at 780.

Following *Heller* and *McDonald*, the federal courts of appeals generally developed a two-step inquiry for deciding Second Amendment challenges. *See Bruen*, 142 S.Ct. At 2126-27 & n. 4. The first step "ask[ed] whether the challenged law impose[d] a burden on conduct falling within the scope of the Second Amendment's guarantee as historically understood." *United States v. Chapman*, 666 F.3d 220, 225 (4th Cir. 2012). If not, the challenge failed. *Id.* But if the statute did not burden

the Second Amendment conduct, then, courts "appli[ed] the appropriate form of means-end scrutiny." *Id*.

The Eighth Circuit did not generally adopt this test, instead imposing a modified means-ends analysis on a case-by-case basis. *See, e.g., United States v. Bena*, 664 F.3d 1180, 1984 (8th Cir. 2011). Oftentimes, as delineated in *Bena*, the Eighth Circuit reviewed a challenged firearms regulations historical roots, finding it valid if it served a generalized public interest.

The Supreme Court's recent opinion in *Bruen* changed the lower courts' framework, holding "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." 142 S. Ct. At 2127. Indeed, "*Heller* relied on text and history. It did not invoke any means-end test such as strict or intermediate scrutiny." *Id*. at 2129. *Bruen* adopted the "text-and-history standard" more consistent with *Heller's* methodology. *Id*. at 2138. That standard directs courts to begin by asking whether "the Second Amendment's plain text covers an individual's conduct." *Id*. at 2126. If it does, then "the Constitution presumptively protects that conduct." *Id*.

Answering this threshold question in *Bruen* was straightforward. At issue in *Bruen* was New York's law providing that, to obtain a permit to carry a handgun in public, an applicant had to demonstrate "proper cause," such as "a special need for self-protection distinguishable from that of the general community." *Id*. at 2122-23. The Supreme Court "ha[d] little difficulty concluding" that "the Second Amendment protects [the petitioners'] proposed course of conduct–carrying handguns publicly for self-defense." *Id*. at 2134. As the Court explained, "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id*. The Second Amendment therefore "presumptively guarantees" a right to carry firearms in public,

5

and New York's "proper cause" requirement, which burdened that right, could pass constitutional muster only if the state overcame the presumption. *Id*. at 2129-30, 2135.

To rebut the presumption of unconstitutionality, *Bruen* held, "the government may not simply posit that [a] regulation promotes an important interest." *Id*. at 2126. "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id*. This test requires courts to "consider whether historical precedent . . . evinces a comparable tradition of regulation." *Id*. at 2131-32. If "no such tradition" exists, then the statute being challenged is unconstitutional. *Id*. At 2132. And insofar as there are "multiple plausible interpretations" of an ambiguous historical record, courts must "favor the one that is more consistent with the Second Amendment's command." *Id*. at 2141 n.11.

The *Bruen* Court explained that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id*. at 2136. For that reason, the relevant historical tradition for purposes of a federal gun regulation is that which existed in 1791, when the Second Amendment was ratified. *Id*. at 2136. Courts may look to the tradition of firearm regulation "before . . . and even after the founding" period, but they should do so with care. *Id*. at 213-32. The Court cautioned, for example, that "[h]istorical evidence that long predates [1791] may not illuminate the scope of the [Second Amendment] right if linguistic or legal conventions changed in the intervening years." *Id*. at 2136. Courts should not "rely on an ancient practice that had become obsolete in England at the time of the adoption of the Constitution and never was acted upon or accepted in the colonies." *Id*.

6

Conversely, courts must "guard against giving postenactment history more weight than it can rightly bear." *Id*. Evidence "of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represent[s] a critical tool of constitutional interpretation." *Id*. The farther forward in time from 1791, the less probative historical evidence becomes." *See id*. at 2137. Evidence from "the mid-to-late-19th century" provides little "insight into the meaning of the Constitution in [1791]." *Id*. Courts may credit such history to the extent it provides "confirmation" of prior practice with which it is consistent but should otherwise afford it little weight. *Id*. Indeed, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id*.

The Court in *Bruen* held that because New York could not point to a robust tradition of regulations similar to the "proper cause" requirement, the state's statute violated the Second Amendment. *Id*. at 2138-56. In reaching that conclusion, the Court did not elaborate a comprehensive scheme for evaluating historical evidence, but it did stake certain guideposts for lower courts to follow. The Court said, for instance, that "[i]n some cases," the historical inquiry "will be fairly straightforward." *Id*. at 2131, *see also id*. (explaining that if "the Founders themselves could have adopted" a particular regulation "to confront" a perceived societal problem," but did not do so, then that regulation is unconstitutional today).

In other cases, challenged statutes will "implicat[e] unprecedented societal concerns or dramatic technological changes," which "may require a more nuanced approach." *Id*. at 2132. When firearms pose "regulatory challenges" that are "not . . . the same as those that preoccupied the Founders in 1791," the "historical inquiry the courts must conduct will often involve reasoning by analogy." *Id*. Deciding "whether a historical regulation is a proper analogue for a distinctly modern

7

firearm regulation requires a determination of whether the two regulations are relevantly similar." *Id*. The Court in *Bruen* declined to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," but it did identify "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. a 2123-33.

The Court also stressed the limits of reasoning by analogy: "[t]o be clear, analogical reasoning under the Second amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted. On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id*.

Whether based on "distinctly similar" precursors or merely historical analogues, the "comparable tradition of regulation" must be robust. *See id*. (requiring "a well-established and representative" historical analogue); *id*. at 2137 (explaining that "a governmental practice" can "guide [courts'] interpretation of an ambiguous constitutional provision" *if* that practice "has been open, widespread, and unchallenged since the early days of the Republic"). A handful of "outlier[]" statutes or cases from a small number of "outlier jurisdictions" do not make out a historical tradition. *Id*. at 2153-2156.

*Bruen* emphasized that "the burden falls on [the government] to show that [a statute] is consistent with this Nation's historical tradition of firearm regulation." *Id*. a 2135. Consistent with

"the principle of party presentation," courts are "entitled to decide a case based on the historical record compiled by the parties." *Id*. a 2130 n. 6.  As a result, courts "are not obliged to sift the historical materials for evidence to sustain [a] statute.  That is [the government's] burden."  *Id*. at 2150.

### The Second Amendment Presumptively Protects Mr. Dixson's Right to Possess a Firearm in Public With an Obliterated Serial Number

As set out in *Bruen*, a Second Amendment analysis begins by asking whether "the Second Amendment's plain text covers an individual's conduct."  142 S. Ct. at 2126.  The Second Amendment protects the right of "the people" to "keep and bear arms."  U.S. Const. Amend. II.  Possession of a firearm with an obliterated serial number, the conduct prescribed in 18 U.S.C.§ 922(k), qualifies at keeping and bearing arms.  *Heller*, 554 U.S. at 628-29.

Mr. Dixson is part of "the people" within the meaning of the Second Amendment.  The court in *Heller* said unambiguously that "the people" refers to all members of the political community, not an unspecified subset.  554 U.S. at 580.  *Heller* further found that the rights set forth in the Second Amendment, like other amendments is exercised individually and belongs to all Americans.  *Id. See also*, *Bruen*, 142 S. Ct. at 2156.

The Second Amendment and the *Bruen* decision stands for the promise that Mr. Dixson's conduct as alleged in Count 7 of the indictment is presumptively protected by the Constitution.  *Bruen*, 142 S. Ct. at 2126.  To rebut the presumption, the government must establish that 18 U.S.C.. § 922(k) is "consistent with this Nation's historical tradition of firearm regulation."  *Id*.  Mr. Dixson alleges that unless the government shows a robust tradition of "distinctly similar historical

9

regulations as of 1791, as embodied in 18 U.S.C. § 922(k), the statute as applied, and generally, is unconstitutional.

It is undisputed that serial numbers were not required or even common in 1791 when the Second Amendment to the Constitution was ratified.  Serial numbers only arose with the beginning of mass production of firearms.  There was, in fact, no legal requirement for serial numbers of firearms of any type until 1934 when Congress passed the National Firearms Act.  Pub. L. No. 73-474, Section 8(a), 48 Stat. 1236, 1239 (1934).  Critically, the statutory requirement of serial numbers only applied to certain firearms such as machine guns and short barreled rifles.

Serial numbers were not generally required for all firearms manufactured and imported to the United States until the passage of the Gun Control Act of 1968.  L. 90-351, Section 902, 82 Stat. 197, 232 (1968).  In enactment of that statute, Congress referred to the Gun Control Act as an act to assist state and local governments in reducing incidents of crime, to increase the effectiveness, fairness and coordination of law enforcement and criminal justice systems in all levels of government, and for other purposes.  *Id*. at 197.  Present day § 922(k), previously § 922(i), made "unlawful for any person knowingly to transport, ship, receive in interstate or foreign commerce, any firearm the importers or manufacturer's serial number which has been removed, obliterated or altered.  Gun Control Act of 1968, Pub. L. 90-351, Section 902, 82 Stat. 197, 231 (1968).  Important to the position of Mr. Dixson, these prohibitions only applied to transporting, shipping, or receiving firearms, not possession.  Prohibition of mere possession of a firearm in which the serial number had been altered or removed was not prohibited by law until the Crime Control Act of 1990, in which § 922 was amended to insert "or to possess or receive any firearm that had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or

transported in interstate for foreign commerce."  Pub. L. No. 101-647, Section 2202(b), 104 Stat. 4789, 4856 (1990).

Clearly, the problems experienced by society, or crimes involving stolen firearms, or crimes involving firearms without serial numbers, certainly existed at the time the Second Amendment was ratified, and existed in 1791.  The only possible argument that would justify the constitutionality of § 922(k) would be that firearms with an obliterated serial number are more likely to be used in crime and, therefore, prohibition on their possession is desirable.  This is exactly the type of means-end argument that was abrogated and forbidden by *Bruen*.  Clearly, the justices in *Bruen* meant what they said in that any prohibition on an individual's Second Amendment rights must be consistent with the Second Amendment's enactment in 1791, and supported by laws and prohibitions in place at that time.

WHEREFORE, Antonio Dixson prays this Honorable Court to dismiss Count 7 of the indictment because it violates the Second Amendment and is unconstitutional both facially and as applied.

/s/ Eric W. Butts
ERIC W. BUTTS, #36184MO
Attorney for Defendant Antonio Dixson
555 Washington Avenue, Suite 600
St. Louis, Missouri 63101
(314) 621-1617
(314) 621-7448 - Facsimile
Email: ewbtts@sbcglobal.net

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 23, 2023, a copy of the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following: Mr. Jason S. Dunkel, Assistant United States Attorneys, 111 South 10th Street, 20th Floor, St. Louis, Missouri 63102.

/s/ Eric W. Butts

12